IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **CHRISTOPHER A. WOLFORD,** | Case No. 5:16 CV 998 |
| Plaintiff, | Judge Dan Aaron Polster |
| v. | Magistrate Judge James R. Knepp II |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | REPORT AND RECOMMENDATION |

### INTRODUCTION

Plaintiff Christopher A. Wolford ("Plaintiff") filed a complaint against the Commissioner of Social Security ("Commissioner"), seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI") and disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated April 26, 2016). Both parties have filed briefs on the merits (Docs. 12 & 15), and Plaintiff filed a reply (Doc. 16). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed applications for SSI and DIB in March 2013, alleging disability as of March 2000. (Tr. 211, 213). The claims were denied initially and on reconsideration. (Tr. 130, 133, 138, 145). An administrative law judge ("ALJ") held a hearing in November 2014. (Tr. 28). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at the hearing. (Tr. 28-29). Following the hearing, the ALJ issued an unfavorable decision. (Tr. 7). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff filed the instant action on April 26, 2016. (Doc. 1).

## FACTUAL BACKGROUND[1]

Plaintiff was born March 25, 1978, and was thirty-six years old on the day of the hearing. (Tr. 60). He has taken classes toward a college degree, and has past work experience as a truck driver. (Tr. 33-34).

Plaintiff's Testimony

Plaintiff testified that he had depression. (Tr. 42). He had a "hard time keeping [him]self motivated . . . everything is kind of falling in." *Id*. He had crying spells, but not lately. *Id*. He stated he was "going to mental health [sessions] so [he was] working through it." *Id*.

Plaintiff did not have any hobbies or activities that he enjoys—and claimed he did not do anything outside of his house. *Id*. Plaintiff testified that he slept only "[s]ometimes a couple hours here and there." *Id*.  Plaintiff had problems with concentration. *Id*. He had a learning disability for which he had just started taking medication. *Id*.

Plaintiff stated Roy Vellunki, M.D., was "his therapist" and that he has seen him since 2003[2]. (Tr. 43, 47). He stated he saw Dr. Vellunki every two to three months "depending on what's needed." (Tr. 43). He also saw a counselor every two weeks. *Id*.

Although he claimed to have anxiety, Plaintiff testified that it was "getting better." *Id*. He stated his anxiety would not limit his ability to work. *Id*.

---

1. Plaintiff challenges only the ALJ's analysis of Dr. Roy Vellunki's opinion regarding Plaintiff's mental impairments; as such, all other issues are waived. *See Young v. Sec'y of Health and Human Servs.*, 925 F.2d 146, 149 (6th Cir. 1990). Thus, for the sake of brevity, the factual background summarized herein will only include evidence related to his mental impairments.
2. The record indicates Plaintiff began seeing Dr. Vellunki on October 24, 2013. (Tr. 1657).

Plaintiff lived with a roommate. (Tr. 46). He stated he did some chores, such as putting away dishes, running the vacuum cleaner, and grocery shopping "late at night" because "[t]here's [sic] not as many people in the store." *Id*. He stated he did not do his own laundry, but, if he had to, he could. (Tr. 47).

Plaintiff was discharged from the military for "anti-social disorder." (Tr. 48). He believed he was precluded from work, in part, because of the anti-social disorder. *Id*.

Plaintiff stated he had one friend he saw "on and off"; otherwise, he did not "associate with anybody." (Tr. 50). Plaintiff's friend drove him to doctor's appointments, for example, or he "hangs out . . . at [Plaintiff's] house . . .". *Id.*

Relevant Medical Evidence

Plaintiff began services at Coleman Behavioral Health in October of 2012. (Tr. 1502). His diagnostic assessment revealed he "denie[d] restrictions in being able to work at th[at] time." (Tr. 1505). Plaintiff also denied feelings of depression, lack of motivation, crying spells, and decreased time spent in interest or enjoyment in life activities. (Tr. 1512-13). Plaintiff reported anxiety, which was triggered when people would judge him. (Tr. 1513). He denied panic symptoms. *Id*. Plaintiff reported he has trouble getting along with authority figures and that his mood swings were "mild/moderate in intensity." *Id*. Plaintiff was diagnosed with episodic mood disorder, attention-deficit hyperactivity disorder (not otherwise specified), and a personality disorder. (Tr. 1517). He denied feeling suicidal or homicidal. (Tr. 1515).

In December 2012, Plaintiff saw nurse Tonya Hamilton. (Tr. 1519). He reported he was "[there] for his anger" and that he had not noticed "much else [wrong with him]" besides his complaints of not sleeping well. *Id*. Ms. Hamilton's mental status examination revealed his mood was "better", he was well-groomed, had a full affect, and a logical thought process. (Tr. 1519-20).

3

Plaintiff reported he was not suicidal or homicidal. (Tr. 1520). Ms. Hamilton noted Plaintiff's level of functioning was impaired "at times" by his symptoms (anxiety, irritability, inattention, mood instability, traumatic stress, impaired sleep, oppositional behaviors, and bereavement issues). (Tr. 1521).

Also in December 2012, Plaintiff met with Raju Reddy, MD, DEA. (Tr. 1533). At Plaintiff's initial visit, Dr. Reddy noted Plaintiff was well-groomed and cooperative, had a full affect and average intelligence, but a tangential thought process. (Tr. 1536-37). Dr. Reddy gave Plaintiff a Global Assessment of Functioning ("GAF") score of 53[3]. (Tr. 1538). He diagnosed Plaintiff with episodic mood disorder, attention-deficit hyperactivity disorder (not otherwise specified), and a personality disorder. *Id*. Plaintiff did not report suicidal or homicidal ideation. (Tr. 1537).

In January 2013, Plaintiff saw Ms. Hamilton again. (Tr. 1522). He complained of sleep apnea and insomnia. *Id*. His mental status examination did not change; Ms. Hamilton noted Plaintiff was "alert to person, place, and time" and that Plaintiff reported, "[t]he sleeping part is the worse [sic] part of it." (Tr. 1523). Plaintiff also saw Ms. Hamilton in April 2013. (Tr. 1525). He reported he "[didn't] have any problems. [He's] doing good with [his medication]." *Id*.

In March 2013, Plaintiff met with Dr. Reddy for a "followup/med.check [sic]". (Tr. 1528). Plaintiff reported his mind was "wired" and that it would not "shut off." *Id*. Plaintiff also reported

---

3. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicated "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers)." *DSM-IV-TR*, at 34. While the GAF scale is no longer used, *Judy v. Colvin*, 2014 WL 1599562, at *9 (S.D. Ohio 2014), it "may assist an ALJ in assessing a claimant's mental RFC." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016).

he had had no crying spells or suicidal thoughts. *Id*. Plaintiff's mental status examination revealed average demeanor, clear and rapid speech, full affect, logical thought process, neutral mood, and no suicidal or homicidal ideation. (Tr. 1528-29). Dr. Reddy's diagnoses remained unchanged. (Tr. 1530). In July 2013, Plaintiff saw Dr. Reddy for another "med check." (Tr. 1589). Plaintiff's mental status examination and Dr. Reddy's diagnoses remained the same. (Tr. 1589-91).

In October 2013, Plaintiff visited Dr. Vellunki for a "[Medication] Recheck." (Tr. 1657). Plaintiff stated his mood "ha[d] been stable" and that he was planning a trip to Arizona to see his sister. *Id*. Plaintiff also stated he was "not depressed sad or hopeless [sic]". *Id*. Plaintiff's mental status examination revealed Plaintiff was "well oriented" with a full affect and a euthymic mood. (Tr. 1657-58). Dr. Vellunki diagnosed Plaintiff with mood disorder, attention-deficit hyperactive disorder (not otherwise specified), and personality disorder (not otherwise specified). (Tr. 1659). He noted Plaintiff was "stable with [his] current treatment". (Tr. 1660).

Plaintiff saw Dr. Vellunki in January 2014 as well. (Tr. 1662). He noted Plaintiff enjoyed his trip to Arizona, that "his mood ha[d] been stable", his sleep was poor "but [he] attribute[d] much of this to his back pain", and that he had no "suicidal or violent thoughts[,] [and no] hallucinations or delusions . . .". *Id*. Plaintiff stated again that he did not feel depressed, sad or hopeless. *Id*. Plaintiff's mental status evaluation revealed he had a full affect and euthymic mood, clear but rapid speech, logical thought process, fair insight and judgment, and was cooperative. (Tr. 1662-63). Dr. Vellunki noted Plaintiff was "stable on current treatment" and diagnosed him with mood disorder, attention-deficit hyperactive disorder (not otherwise specified), and personality disorder (not otherwise specified). (Tr. 1664-65). Dr. Vellunki did not update Plaintiff's medication. (Tr. 1665).

5

In April 2014, Plaintiff saw Dr. Vellunki again. (Tr. 1667). Plaintiff stated he was attending college, and that he had "some difficulty with keeping up in the coursework", but his "mood ha[d] been stable." *Id*. He was not depressed, sad, or hopeless. *Id*. On Plaintiff's mental status examination, Dr. Vellunki noted Plaintiff had a cognitive impairment in attention and concentration, but that he was a low level of risk. (Tr. 1668). Dr. Vellunki prescribed him Strattera; otherwise, Dr. Vellunki noted Plaintiff was "stable with current treatment . . .". (Tr. 1670).

In July 2014, Plaintiff reported to Dr. Vellunki that "[he] did well with his grades last semester." (Tr. 1672). Plaintiff's mental status examination remained the same. (Tr. 1672-73). In September 2014, Plaintiff reported to Dr. Vellunki that "Strattera [was] helping with his concentration." (Tr. 1677). He reported to Ms. Hamilton June 2014 that he had "gotten a lot better." (Tr. 1685). Finally, Plaintiff reported to counselor Adam Rebh in September 2013 that he had achieved "continued success" in schooling. (Tr. 1694). Plaintiff also revealed to Mr. Rebh in January 2014 that he spent time playing video games. (Tr. 1706).

Plaintiff met with Mr. Rebh again in May 2014. (Tr. 1730). Plaintiff reported "improvements in functioning since recent medication adjustment" and commented that he was "'more focused.'" (Tr. 1732).

Opinion Evidence

*State Agency Consultants*

On May 15, 2013, state agency psychologist Katherine Fernandez, Psy.D., reviewed the record. (Tr. 83-84). Dr. Fernandez reported Plaintiff has mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (Tr. 83). In

6

August 2013, state agency psychologist Karla Voyten, Ph.D., also reviewed the record and made identical findings. (Tr. 100-101).

*Dr. Vellunki's Opinion*

On February 13, 2014, Dr. Vellunki filled out a Mental Impairment Questionnaire. (Tr. 1597). He noted Plaintiff was "[s]eriously limited"[4], but not "[u]nable to meet competitive standards"[5] in: (1) "[m]aintain[ing] attention for [a] two-hour segment"; (2) "[w]ork[ing] in coordination with or proximity to others without being unduly distracted"; (3) "[p]erform[ing] at a consistent pace without an unreasonable number and length of rest periods"; (4) "[a]ccepting instructions and respond[ing] appropriately to criticism from supervisors"; (5) "[g]ett[ing] along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes". (Tr. 1599). Dr. Vellunki marked Plaintiff between "[s]eriously limited" and "[u]nable to meet competitive standards" in the area of "[c]omplet[ing] a normal workday and workweek without interruptions from psychologically based symptoms". *Id.*

Dr. Vellunki rated Plaintiff's functioning as "[l]imited but satisfactory"[6] in the following areas: (1) "[r]emember[ing] work-like procedures"; (2) "[u]nderstand[ing] and remember[ing] very short and simple instructions"; (3) "[c]arry[ing] out very short and simple instructions"; (5) "[s]ustain[ing] an ordinary routine without special supervision"; (6) "[m]ak[ing] simple work-related decisions"; (7) "[a]sk[ing] simple questions or request[ing] assistance"; (8) "[r]espond[ing] appropriately to changes in a routine work setting"; and (9) "[b]e[ing] aware of normal hazards

---

4. "*Seriously limited* means [the] patient has noticeable difficulty (e.g., distracted from job activity) from 11 to 20 percent of the workday or work week." (Tr. 1599) (emphasis in original).
5. "*Unable to meet competitive standards* means [the] patient has noticeable difficulty (e.g., distracted from job activity) from 21 to 40 percent of the workday or work week." (Tr. 1599) (emphasis in original).
6. "*Limited but satisfactory* means [the] patient has noticeable difficulty (e.g., distracted from job activity) no more than 10 percent of the workday or work week." (Tr. 1599) (emphasis in original).

and tak[ing] appropriate precautions". *Id.* Dr. Vellunki marked Plaintiff between "[l]imited but satisfactory" and "[s]eriously limited" in the area of "[m]aintain[ing] regular attendance and be[ing] punctual within customary, usually strict tolerances". *Id.*

Dr. Vellunki found Plaintiff had moderate restriction in activities of daily living; marked[7] difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation within a twelve month period, each of at least two weeks duration. (Tr. 1601). While Dr. Vellunki noted Plaintiff had one or two episodes of decompensation within a twelve month time period, he did not respond to a question about the approximate dates of those episodes. *Id.* Dr. Vellunki's prognosis for Plaintiff was "poor". (Tr. 1597). In response to a question about Plaintiff's "[t]reatment and response", Dr. Vellunki wrote: "[p]er psychiatric notes on 10/24/13 and 01/23/14, Ct. 'stable with current treatment'". *Id.* Dr. Vellunki admitted to knowing Plaintiff under four months. *Id.*

ALJ Decision

In his written decision, the ALJ concluded Plaintiff had not engaged in substantial gainful activity since his alleged onset date, and had severe impairments of: "migraine headaches; chronic obstructive pulmonary disease and/or asthma; a personality disorder; depression/mood disorder; intermittent explosive disorder; [and] attention deficit hyperactivity disorder". (Tr. 12). He concluded these impairments did not meet or equal the listings (Tr. 13) and Plaintiff retained the residual functional capacity ("RFC") to perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant: can lift and/or carry 30 pounds occasionally and 15 pounds frequently; can stand and/or walk six hours and sit six hours in an eight-hour workday; can push and/or pull consistent with the lifting limitations; should never climb ladders or scaffolds; can climb ramps or stairs less than two hours per day; can occasionally stoop, kneel, crouch, or crawl; can occasionally reach overhead bilaterally; can occasionally be

---

7. "**Marked** means more than moderate but less than extreme." (Tr. 1601) (emphasis in original).

8

> exposed to extreme heat, cold, wetness, and humidity; can occasionally be exposed to irritants such as fumes, odors, dust, gases, and poorly ventilated areas; is limited to moderately complex tasks up to five steps; is limited to occasional decision making, occasional changes in the work setting, and no strict quota requirements; can occasionally interact with the pubic, so long as the interaction is brief and superficial; can occasionally interact with co-workers, so long as the interaction is brief and superficial; can occasionally interact with supervisors; and is expected to have one unscheduled absence per month due to the combination of his impairments.

(Tr. 16). Based on the VE's testimony, the ALJ concluded Plaintiff could perform jobs in the national economy and, therefore, was not disabled. (Tr. 20-21).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

9

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can claimant perform past relevant work?

5. Can claimant do any other work considering his RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*. The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id*. Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ erred in his evaluation of Dr. Vellunki's opinion. (Doc. 12, at 7). Specifically, Plaintiff objects to the ALJ's failure to: (1) acknowledge Dr. Vellunki as a treating source; and (2) assess Dr. Vellunki's opinion pursuant to the treating physician rule. *Id*. at 7, 9.

The Commissioner responds Dr. Vellunki is not a treating source and, in the alternative, the ALJ did not err in his evaluation of Dr. Vellunki's opinion. (Doc. 15, at 12-13).

<u>Dr. Vellunki's Opinion</u>

Generally, the opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the

11

frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009).

On February 13, 2014, Dr. Vellunki filled out a Mental Impairment Questionnaire. (Tr. 1597). In response to the request to "Describe the *clinical findings* including results of mental status examination that demonstrate the severity of your patient's mental impairment and symptoms", Dr. Vellunki stated: "[Claimant] reports history of impulse control issues which has resulted in acts of aggression and legal issues. [Claimant] also reports issues with focus/concentration interferes with his schooling/ability to stay on task." *Id*. (emphasis in original). Dr. Vellunki listed Plaintiff's prognosis as "poor". *Id*. When prompted to "[i]ndicate to what degree the following functional limitations exist as a result of [the claimant's] mental impairments", Dr. Vellunki indicated: moderate restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; and one or two episodes of decompensation within 12 month period, each of at least two weeks duration. (Tr. 1601).

Initially, Plaintiff is correct the ALJ did not specifically state whether Dr. Vellunki qualified as a treating physician. The undersigned, however, finds it unnecessary to discuss whether or not Dr. Vellunki qualifies as a treating physician. This is so because the undersigned finds the ALJ adequately evaluated the opinion pursuant to the treating physician rule by providing "good reasons" for providing it "little weight".

First, the ALJ explained that Plaintiff's self-reported "history of impulse control"—identified by Dr. Vellunki as a "clinical finding[] . . . demonstrating the severity of [Plaintiff's] mental impairment and symptoms" (Tr. 1597)—was not supported by the record, as Plaintiff "[had] not had any recent legal trouble, aside from seeking custody of his children, and there [was] no indication he [had] displayed uncontrollable or violent behavior." (Tr. 18). The record shows Plaintiff reported emotional distress while attempting to regain custody of his children (Tr. 1463), and where he was struggling with personal relationship issues (Tr. 1476, 1748). A medical record dated October 24, 2013, notes Plaintiff "ha[]d been in jail 2 times, breaking and entering, domestic violence" and was "ordered to treatment " for aggression. (Tr. 1657).[8] The Commissioner concedes Plaintiff has "a single, past conviction for domestic violence." (Doc. 15, at 13) (citing Tr. 1657). The undersigned notes that whether or not the conviction of domestic violence is "recent", it may indeed be indicative of "uncontrollable or violent behavior" and, as such, this is not a "good reason" for discounting the opinion. Regardless, it was not the only reason provided.

Second, the ALJ noted Plaintiff reported "occasional problems" focusing and concentrating, but his medication regime seemed to be effective; his treatment providers, including Dr. Vellunki, did not appear to be concerned with his symptoms "during regular medical visits"; and the record did not indicate consideration of alternative treatment. (Tr. 18). This reason is also supported by substantial record evidence. Evidence in the record does not support the severity of Dr. Vellunki's stated functional limitations and Plaintiff's impairments seem well-managed on

---

8. Plaintiff submitted correspondence to the Appeals Council detailing his past legal history; however, that letter cannot be considered by the Court. (Tr. 329). *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.") (citing *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993)).

13

medication. While the record shows "some" complaints of difficulty with college coursework (Tr. 1670), it also reveals Plaintiff was generally stable with medication and had unremarkable mental status findings. (Tr. 1657-58, 1660, 1665, 1670, 1747-48). In his opinion, Dr. Vellunki noted Plaintiff was "seriously limited" in maintaining concentration for a two-hour period (Tr. 1599), but in his treatment notes from October 2013 and January 2014 he noted Plaintiff had no impairment in concentration or attention (Tr. 1658, 1663). Also, in a record from September 2014, while Plaintiff was attending school to become a paralegal, he stated he had earned good grades and had improved concentration while on the medication Strattera. (Tr. 1677).

Third, the ALJ determined the extreme limitations found by Dr. Vellunki and Plaintiff's testimony regarding social interaction, were unsupported by the record. (Tr. 18-19).

Fourth, and similarly, the ALJ noted Plaintiff's testimony regarding dependency on his mother for financial assistance and his roommate for "nearly everything else . . . and the household" was unsupported by the medical evidence. (Tr. 19). Indeed, the generally unremarkable mental status findings in the record do not support the severity of Dr. Vellunki's limitations. *See* Tr. 1657-58, 1660, 1665, 1670, 1747-48.

Fifth, the ALJ stated Dr. Vellunki's opinion that Plaintiff would likely be absent from work three or more days a month was unsupported by his treatment notes which revealed conservative treatment, and the medical record as a whole. *Id.* The ALJ pointed out that Plaintiff saw Dr. Vellunki once every three months and there was no indication more frequent treatment was necessary, "which would be expected if the claimant were likely to miss so much work due to his mental symptoms." *Id.* He also noted there had been "no significant changes or additions . . . made to the claimant's psychotropic medications", indicating his impairments were well-managed on medication. *Id.* Indeed, The Sixth Circuit has relied upon a claimant's conservative treatment

14

record to discount allegations of disability or to discount a medical opinion. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) ("The ALJ noted that the records indicate Kepke received only conservative treatment for her ailments, a fact which constitutes a 'good reason' for discounting a treating source opinion"); *Lester v. Comm'r of Soc. Sec.*, 596 F. App'x 387, 389 (6th Cir. 2015) (finding ALJ reasonably discounted a doctor's proposed limitations because, among other things, the claimant was receiving conservative treatment); *Francis*, 414 F. App'x at 806 ("the ALJ reasonably viewed Francis's limited treatment as inconsistent with Dr. Wakham's opinion"); *see also* 20 C.F.R. § 1527(c)(2)(ii) ("We will look at the treatment the source has provided . . . . ").

Plaintiff attempts to rebut this by noting that on April 11, 2014, Dr. Vellunki added the medication Strattera, first prescribing 18 mg and then increasing to 40mg. (Doc. 12, at 10-11). However, the ALJ did not state there were "no" changes in psychotropic medication, but rather no "significant" changes or additions; Plaintiff fails to explain how the addition of Strattera is "significant" or inconsistent with the ALJ's recitation of the facts. Additionally, Plaintiff reported Strattera helped improve his concentration. (Tr. 1677). Plaintiff also notes he complained of headaches caused by the medication Trazadone, but concedes "his dosage was ultimately kept the same." (Doc. 12, at 11) (citing Tr. 1734). The undersigned is not persuaded that this fact somehow shows error in the ALJ's determination.

For those reasons, the ALJ assigned Dr. Vellunki's opinion "little weight". *Id.* The ALJ's reasoning speaks to the supportability of the opinion and consistency with the record. *See Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) (finding that express consideration of supportability and consistency is sufficient); *Bennemann v. Comm'r of Soc. Sec.* 2012 WL 5384974, at *7 (N.D. Ohio) (same). The ALJ discussed Dr. Vellunki's functional capacity

15

assessments and assigned them "little weight" because he found they were contradicted by the medical evidence. The ALJ's reasons—as a whole, and in the context of the record as a whole—are "'sufficiently specific to make clear'" to this reviewer "'the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Wilson v. Comm'r,* 378 F.3d 541, 544 (6th Cir. 2004) (quoting SSR 96-2p, 1996 WL 374188, at *5). Therefore, the "good reasons" requirement is satisfied, and the ALJ's decision is supported by substantial evidence in this regard.

GAF Scores

Within his treating physician argument, Plaintiff also briefly asserts the ALJ erred by assigning "seemingly" greater weight to Plaintiff's GAF scores than to the opinion of Dr. Vellunki. (Doc. 12, at 8). This assertion is not well-taken.

In the Sixth Circuit, courts are directed to "take a case-by-case approach to the value of GAF scores." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836 (6th Cir. 2016). GAF scores are not dispositive, but rather "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x. 681, 684 (6th Cir. 2011).

Here, the ALJ briefly discussed Plaintiff's GAF scores:

Regarding his mental impairments, treatment notes from Coleman Counseling Services show Global Assessment of Functioning scores in the mid-50s range, scores consistent with only moderate mental limitations (Exhibit 13F). However, there are higher scores in the record from Phoenix Rising Behavioral Health. In December 2009, he was assigned a Global Assessment of Functioning score of 65 (mild limitation), and two years later in early 2011, he was assigned a Global Assessment of Functioning score of 60, which is consistent with moderate to nearly mild mental symptoms (Exhibit 9F). The claimant's mental symptoms reportedly worsened in late 2012, but the symptoms appear to be related to situational stressors. Specifically, the claimant was trying to regain custody of his children (Exhibit 13F). The claimant also reported being angry at his ex-girlfriend, refusing to pay bills accumulated while they were together, and a desire to sue her.

16

> Additionally, the claimant reported stress related caused by being a go-between for his mother and sister (Exhibit 24F). Despite these stressors, several treatment notes describe the claimant's condition as stable.

(Tr. 18).

The ALJ appropriately discussed the GAF scores in the record and considered them in his disability analysis. There is no evidence the ALJ based his disability determination solely on Plaintiff's GAF scores, but rather analyzed them in conjunction with the entire medical record, putting them into context. Thus, the undersigned finds no error in the ALJ's discussion of Plaintiff's GAF scores.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying benefits supported by substantial evidence, and therefore recommends the Commissioner's decision be affirmed

s/James R. Knepp II  
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).